**UNITED STATES of America, Plaintiff,**

v.

**Robert R. COURTNEY, Defendant.**

**No. CR.A.01–00253–01–CR–W–3.**

United States District Court, W.D. Missouri, Western Division.

Jan. 14, 2002.

See, also, 2002 WL 31771105.

## ORDER DENYING DEFENDANT'S MOTION FOR RELEASE ON BOND

LARSEN, United States Magistrate Judge.

Before the court is defendant's motion to reconsider the detention order entered on August 21, 2001. After considering the evidence presented at the hearing on De-cember 17, 2001, and December 19, 2001, I find that there is no single condition or combination of conditions of release that could reasonably assure the appearance of defendant as required. Therefore, defendant's objections to the detention order will be overruled and the motion to amend the detention order and release defendant on bond will be denied.

## I. BACKGROUND

On August 14, 2001, a criminal complaint was filed charging defendant with one count of dispensing cancer-treating drugs Gemzar ® an Taxol ® which had been mis-labeled and adulterated, with intent to de-fraud, in violation of 21 U.S.C. §§ 351(b) and (d); 352(a) and (b); 331(a), (b), (c), and (k); and 333(a)(2). Defendant voluntarily surrendered and appeared before me for his first appearance on Wednesday, Au-gust 15, 2001. During the first appearance proceeding, I sua sponte ordered a deten-tion hearing after finding that there was a serious risk that defendant would flee. The government and defendant made a joint, oral motion to continue the hearing for three days. The motion to continue was granted, and the defendant was re-manded to the custody of the United States Marshal pending the hearing.

On August 17, 2001, the government filed a "response to court's order setting a detention hearing". In that response, the government provided the following infor-mation: On the morning of August 13, 2001, three IV drug bags were obtained from defendant's pharmacy, ostensibly for treatment of cancer patients but actually for the purpose of testing the quantity of the prescribed drug. After those bags had been obtained, federal agents interviewed defendant at his pharmacy and advised him that the potency of three IV drug bags mixed at defendant's pharmacy on August 7 had been tested and found to be

significantly diluted. Defendant had no plausible explanation for that. During that interview, defendant admitted that he had mixed the IV drug bags that had been obtained that morning. A search warrant was executed at defendant's pharmacy that day. The following day, a complaint was filed and defendant agreed to be interviewed by federal agents just prior to his initial appearance. During that interview on August 15, 2001, defendant admitted that he had been diluting cancer treating drugs for almost a year, and that his motivation was money.

The government's response also stated as follows:

The government is diligently investigating a broad range of activity engaged in by the defendant. Among other things, the government is investigating whether the defendant has engaged in conduct that justifies either civil or criminal forfeiture of assets acquired through or used to commit or facilitate unlawful activity.... If during the pendency of its investigation the government believes that assets constituting the proceeds of illegal conduct or assets used to commit or facilitate illegal conduct are being withdrawn, transferred, removed, dissipated or disposed of by the defendant, or that he has caused others to do the same, then the government will take prompt legal action to redress the situation.

Finally, the government indicated that there are countries which would refuse to extradite defendant if he were to flee, and cited cases holding that the difficulty of extraditing a defendant adds to the risk of flight.

A detention hearing was held on Monday, August 20, 2001. After considering the evidence presented at that hearing, I found by a preponderance of the evidence that defendant poses a risk of flight, and that no single condition of release or combination of conditions of release can reasonably assure the appearance of defendant as required. In addition, I found by clear and convincing evidence that defendant posed a danger to the community, and that no single condition of release or combination of conditions of release will assure the safety of the community. A order outlining my reasons was filed on August 21, 2001. The conclusion of that order stated as follows:

I find by a preponderance of the evidence that no single condition of release or combination of conditions of release will reasonably assure the appearance of defendant as required. Defendant is facing a criminal trial on this charge, and possibly on numerous other charges. To date, at least five civil lawsuits, including one class-action lawsuit, have been filed against defendant. It is likely that his financial assets will be reduced, if not extinguished, in both the criminal and civil litigation. Defendant argued that fleeing was "unimaginable" because it would leave his family with no money, no resources, and no support. However, a criminal conviction and the pending civil lawsuits will likely leave his family in the same condition. Defendant lied to the authorities, indicating that he did not know how the prescriptions had gotten diluted, then offered multiple implausible explanations for the dilution. The following day, defendant admitted to at least some of the violent conduct for which he is charged. There is some evidence, albeit unconfirmed, that defendant has transferred approximately $2 million to the Cayman Islands and purchased a residence in St. Croix. During the hearing, defendant admitted having traveled to St. Croix during the last couple of weeks but failed to report this recent trip to Pretrial Services [FN: Defendant argued that St. Croix is not "foreign travel" and he therefore did not

report it; however, Pretrial Services asked about travel "outside the United States"]. In addition, defendant told the federal agents that tax problems prompted him to dilute prescriptions; yet, defendant was apparently financially able to consider purchasing more property in St. Croix. Finally, it is questionable whether defendant could be extradited if he chose to flee to a foreign country to avoid prosecution.

In addition, I find by clear and convincing evidence that no single condition of release or combination of conditions of release will reasonably assure the safety of the community. Defendant is charged with adulterating and mislabeling cancer-treating drugs, and at least one of the patients who received the adulterated drugs is dead. Defendant has admitted to behavior that I find both startling and violent. Defendant was in a position of trust, the person responsible for providing medication to individuals fighting a terminal disease. In cancer cases, the type of medication withheld by defendant can often be the difference between life and death. Defendant's willingness to abuse his position of trust by significantly increasing the risk of death to cancer patients, merely to increase his already significant financial wealth, is shocking.

In addition, the penalty faced by defendant at present (a statutory three-year maximum prison sentence), is not representative of the violent conduct he has admitted committing. The Food, Drug and Cosmetic Act was not drafted to punish the withholding of life-saving drugs from terminally-ill patients [FN: This is not to say that I believe the statute was incorrectly charged. It was not. As stated by the Supreme Court in *United States v. Dotterweich*, 320 U.S. 277, 280, 64 S.Ct. 134, 88 L.Ed. 48 (1943), "[t]he purposes of this legislation . . . touch phases of the lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection." Certainly in this case the patients who received the diluted drugs were beyond self-protection. However, the lenient sentence provided for in the statute indicates that the conduct of the defendant in this case goes far beyond what the Act had originally contemplated.] Rather, the Act contemplates conduct such as passing off generic drugs as non-generic and failing to properly label containers with information such as lot numbers and expiration dates.

Under the same statute used to charge defendant, a pharmacist in the Eastern District of Missouri was convicted of misbranding drugs after he stored cough syrup in jugs which were not meant for long-term storage. *United States v. Dino*, 919 F.2d 72 (8th Cir. 1990), *cert. denied*, 502 U.S. 808, 112 S.Ct. 50, 116 L.Ed.2d 28 (1991). The government's evidence established that Dino, the pharmacist, received bags of samples not marked with lot numbers, serial numbers, or expiration dates; and Dino stored those samples in a jug (also not marked) for later resale. The court noted that "doctors, patients, and drug manufacturers all rely on pharmacists to sell safe and effective drugs—not drugs impossible to trace for a recall, or which may have surpassed an expiration date." *Id.* at 75.

The defendant in *United States v. Walsh*, 331 U.S. 432, 67 S.Ct. 1283, 91 L.Ed. 1585 (1947), distributed a shipment of vitamin products which were adulterated and misbranded. In *United States v. Sullivan*, 332 U.S. 689, 68 S.Ct. 331, 92 L.Ed. 297 (1948), the defendant received properly labeled bottles of sulfathiazole tablets [Antibacterial tablets used to treat vaginal yeast infections] and held the tablets for resale. On two

separate occasions, he removed twelve tablets from the properly labeled bottles, placed the twelve tablets in pill bottles, and sold them to customers. The pill containers did not have the statutorily required adequate directions for use or warnings of danger. The defendant in that case was convicted of misbranding.

A maximum three-year sentence for selling sulfathiazole tablets in pill bottles not adequately marked, a maximum three-year sentence for storing for resale cough syrup in an improper jug, a maximum three-year sentence for selling misbranded vitamins—these in my opinion are the types of crimes for which the misbranding statute was passed. In this case, however, defendant withheld medication knowing that the medication could save the life of a patient struggling with a terminal disease. Lives were absolutely at stake, and were possibly lost, due to defendant's conduct. This is clearly, in my opinion, a crime of violence.

Defendant admitted having dispensed cancer-treating drugs on August 13, 2001, to a doctor who defendant believed would use the drugs on individuals fighting cancer. Defendant's willingness to risk the lives of several people, who could possibly have suffered preventable deaths, in order to add to his fortune of over $10 million clearly establishes the danger he presents to the community. If he is willing to commit and then admit to such conduct, I cannot imagine what else he may be capable of.

On August 23, 2001, an indictment was returned charging defendant with eight counts of tampering with a consumer product, in violation of 18 U.S.C. §§ 1365(a) and 1365(a)(3); six counts of adulteration of a drug, in violation of 21 U.S.C. §§ 331(k) and 333(a)(2); and six counts of misbranding a drug, in violation of 21 U.S.C. §§ 331(k) and 333(a)(2).

On November 5, 2001, defendant filed a motion to review the detention order. In his motion, defendant alleges that the following claims originally made by the government are inaccurate:

- Defendant had, within the last month, purchased a condominium in St. Croix.

- Defendant had made a recent transfer of more than $2 million to the Cayman Islands.

- By traveling to the Cayman Islands, defendant had traveled "outside the United States" yet failed to notify Pretrial Services about the trip during an interview.

Defendant makes the following arguments in support of his motion for release on bond:

1. St. Croix is one of the U.S. Virgin Islands. Given its status as an American territory, St. Croix is subject to the jurisdiction of the U.S. Constitution and federal courts. "In light of this fact (which was also made to Magistrate Larsen during the detention hearing), Mr. Courtney's omission is neither misleading nor indicative of untruthful conduct. In addition, taking this holding to its logical conclusion, any defendant who fails to report trips to either Alaska or Hawaii may be subject to similar scorn for failing to inform Pretrial Services about travel outside of the *contiguous* United States."

2. There is no evidence that defendant ever purchased a condominium in St. Croix.

3. There is no evidence that defendant transferred $2 million to the Cayman Islands.

4. All of defendant's individually held assets have been frozen by Judge Wright's September 20, 2001, preliminary injunction.

On November 29, 2001, the government filed a response to defendant's motion to review detention order. The government argues that although defendant does not claim to have new evidence, he presents information in his motion which was not before the court prior to the original detention order. In addition, the government makes the following arguments:

1. The single-count misbranding charge in the complaint has been replaced with a twenty-count indictment. Instead of facing a maximum of 3 years in prison, defendant now faces a maximum of 196 years in prison.

2. At the time of the detention hearing, there were five civil cases pending. At the time the government filed this response, there were more than 150 civil lawsuits pending.

3. At the time of the detention hearing, defendant had control of over $8 million which was frozen by Judge Wright in a preliminary injunction which was issued one month after the detention order was filed. "Because the most substantial and valuable assets he owns can no longer be called 'his' in any real sense, he has no significant assets available to post as security for a bond where the loss of them would cause him to hesitate before fleeing. With nearly all of his money gone, the only thing he has left to preserve is his personal freedom, and a conviction at the conclusion of his criminal trial threatens to take that away from him for the rest of his life."

4. The weight of the evidence against defendant is overwhelming. Defendant admitted having prepared the drugs which were obtained undercover, all of which were sub-potent. In addition, defendant admitted having diluted the drugs for financial gain.

5. "Courtney's professional, ethical, and moral obligations as a pharmacist [were] insufficient to keep him from repeatedly risking lives for the sake of money. Courtney's supposedly devout participation in his church and religious community did not deter him from committing unprecedented acts of cold-blooded torture on helpless and unsuspecting terminally ill cancer patients. When his past behavior demonstrates he has complete disregard for his own professional and spiritual obligations—obligations that he argues to this court are the ones which he has a deep respect for—what reason is there to believe he would regard a court order with any level of respect?"

6. Defendant originally lied to the investigators when he denied being involved in tampering with chemotherapy drugs. When he finally did admit to the tampering, he claimed his tampering conduct was limited to Gemzar®, Taxol®, Paraplatin®, and Platinol®. Laboratory testing later confirmed that Courtney also diluted or tampered with Procrit®, Neupogen®, Interferon, and Zofran®. Courtney's denial of tamperings with other drugs has now proved to be yet another lie.

7. Recorded telephone conversations between defendant and family members after defendant was taken into custody suggest that he was engaging in evidence destruction and improper funds transfers.

8. Defendant has ready access to a licensed pilot and could flee without needing either a commercial airliner or a passport.

On December 12, 2001, Judge Ortrie Smith referred this matter to me for reconsideration on the ground that both parties had attempted to introduce new evidence and therefore an additional hearing was warranted.

On December 17, 2001, and December 19, 2001, I held a hearing on defendant's motion, in conjunction with hearings on several other pretrial motions. Defendant was present, represented by James R.

Hobbs, W. Brian Gaddy, Mark W. Hagemeister, and David B.B. Helfry. The government was represented by Assistant United States Attorneys Gene Porter and Andrew Lay. Defendant called the following witnesses:

1. Tim Wrigley, friend of defendant

2. Special Agent David Parker

In addition, defendant made the following proffer without objection by the government:

There is no evidence whatsoever regarding transfers by Mr. Courtney to the accounts to the Cayman Islands. In addition, there was one transfer by Mr. Courtney to Laura Courtney that was requested before any Court orders, including the August 22nd temporary restraining order. Part of that transfer was completed prior to the Court order.

So our best knowledge, based on my best knowledge and belief, that has not been attacked to date in any civil proceedings. There has been no attempt to set aside the transfer during the preliminary injunction held on September 20th.

Another transfer also to Mrs. Courtney was completed after the preliminary injunction, and to my best knowledge, the parties were represented in that transaction. Mrs. Courtney had counsel, Mr. German and his office; and I believe Mr. Jean Paul Bradshaw was involved in some of those discussions. And to the extent that the government was contacted, I believe that there was contact, primarily through Mr. Lay.

It is finally part of our proffer and understanding that at the time of the transfers, Mr. Courtney relinquished all rights, claims to monies transferred and has no access to those funds as we speak here today.

(1Tr. at 79–80)[1].

The government added the following proffer without objection by the defendant:

[A]fter the execution of the search warrant at the Research Medical Tower Pharmacy on August 13th, after the filing of the one count complaint against the defendant on August 14th, there was an attempted transfer of in excess of $5 million by the defendant to his wife. A portion of that transfer was completed, and through the efforts of the United States, a portion of it was not completed. That portion of roughly $2 million, in excess of $2 million, has not been distributed to anyone. And the other portion of that over $5 million transfer was completed.

[S]hortly after the search warrant there was an attempt to transfer a large amount of money to the wife.

Several days after that, Judge Wright entered his order and interrupted about half of the proposed transfer.

The temporary restraining order was with the consent of both parties, that half of the proposed transaction of the dollar amount was so large that it took a lot of time for the banks to put it together and to pull it from different accounts. The government was not aware of [the transfer before it occurred]. As we began to subpoena financial records, we became aware of a lot of financial activity, and then we were moving as quickly as possible to put together the plans to stop the transfers.

Approximately $2.6 million of the intended transfer is still in the custody of the financial institution.

---

1. "1Tr." refers to the transcript of the supplemental detention hearing held on December 17, 2001, and December 19, 2001.

When the temporary restraining order was converted to a preliminary injunction, counsel for Mr. Courtney and the government agreed to freeze a higher number, and the remainder of that was a six figure sum that went to the wife. On top of the six, the parties are currently negotiating as to the status of all of the assets Mr. Courtney had or has transferred recently.

[T]he detention hearing occurred on August 20th. The first order entered by Judge Wright was on August 22nd, two days later. And our first knowledge of the transfer of $5 million plus to Mrs. Courtney was after August 22nd.

(1Tr. at 80–84).

## II.  FINDINGS OF FACT

On the basis of the evidence presented during the original detention hearing and the evidence hearing held during the week of December 17, 2001, I make the following findings of fact:

1.  Shortly before the present criminal investigation was revealed to defendant, Special Agent David Parker flew to St. Croix and spoke with a realtor (1Tr. at 62, 63). Special Agent Parker was investigating a claim that defendant had flown to St. Croix and was shown some property by this realtor (1Tr. at 62).

2.  Subsequent to the August 20, 2001, detention hearing, Special Agent Parker confirmed that defendant did, in fact, take a trip to St. Croix for the purpose of exploring the opportunity to purchase real estate (1Tr. at 64–65). The realtor told Special Agent Parker that defendant was "extremely interested" in a particular piece of property—a "high-priced condominium"—but he wanted to go back and discuss it with his wife before he made any final decision (1Tr. at 65, 72). This was very shortly before the August 13, 2001, search of defendant's pharmacy and the filing of the criminal complaint (1Tr. at 65–66).

3.  During the August 20, 2001, detention hearing, Special Agent Parker testified that he was investigating whether defendant had transferred approximately $2 million to an account in the Cayman Islands (1Tr. at 66). Although Special Agent Parker was not able to confirm that $2 million was transferred to the Cayman Islands, he did learn that at approximately the same time of the alleged $2 million Cayman Islands transfer, defendant transferred in excess of $2 million to his wife, Laura Courtney (1Tr. at 66, 67, 71).

4.  After the criminal complaint was filed on August 14, defendant attempted to transfer in excess of $5 million to his wife (1Tr. at 71, 80–84). More than $2 million was transferred; however, the dollar amount was so large that it took a lot of time for the banks to put it together and pull the money from different accounts (Tr. at 80–84). Judge Wright entered a temporary restraining order on August 22, interrupting the transfer of the remaining $2.6 million (Tr. at 80–84). The government did not learn of the attempted $5 million transfer until after Judge Wright entered the August 22 temporary restraining order (Tr. at 80–84).

5.  On August 15, 2001, the day defendant was unexpectedly taken into custody, Special Agent Parker picked up defendant and his attorney, Jean Paul Bradshaw, at Mr. Bradshaw's office (2Tr. at 10–11, 45).[2] Special Agent Parker then drove defendant and Mr. Bradshaw to the FBI offices where defendant made a statement (2Tr. at 11, 44). Defendant's car was left at Mr. Bradshaw's office. Defendant had been told that the government was not going to request pretrial detention (2Tr. at 43).

---

**2.**  "2Tr." refers to the transcript of the hearing on the motion to suppress evidence.

6. After defendant provided a statement, Special Agent Parker drove defendant and his attorney to the United States Courthouse for his initial appearance on the complaint (2Tr. at 44). During the initial appearance when I sua sponte moved to have a detention hearing, Special Agent David Parker was surprised, Assistant United States Attorney Gene Porter was surprised, and defense attorney Jean Paul Bradshaw was surprised (2Tr. at 97–98). Defendant also appeared surprised.

7. That evening, defendant had a telephone conversation with his wife, Laura Courtney (D.Ex. 30a). That conversation went as follows:

Laura: Did they tell you we got your car?

Def.: Oh, you did?

Laura: Yeah, we went, Andy and Vanessa went down to get it.

Def.: Ok.

Laura: And we got your personal belongings.

Def.: Ok. There's um, in the trunk of my car

Laura: Uh huh

Def.: There's um, two boxes that are, that are trash

Laura: Yeah

Def.: And, so would you throw those away, they say trash on 'em.

Laura: Ok.

Def.: And, there is a ummm, there's a white umm, sack in there

Laura: Uh huh

Def.: That has some, old stuff in it that ummm, need to be thrown away.

Laura: Ok.

Def.: Just, you know, outdated medicine that needs to be thrown away. I had meant to get that done, but this, you know

Laura: Yeah, we'll take care of it.

Def.: Wasn't expecting this, or I would have, gonna have it thrown away myself.

Laura: Ok. Is there anything else you want us to take

Def.: Well...

(D.Ex. 30a).

8. On the evening of August 20, 2001, after the detention hearing, defendant ("Def.") spoke with his father, Robert L. Courtney ("Dad"), and his wife, Laura Courtney ("Laura") (1Tr. at 67; D. Ex. 32b; P.Ex. 8). Both defendant's wife and father were present in the courtroom during the detention hearing earlier that day and heard the allegations regarding the attempted purchase of property in St. Croix and the attempted transfer of $2 million to an account in the Cayman Islands (1Tr. at 68). The following conversation took place:

Dad: We were just so sorry that you didn't get to come home with us.

Def.: Well you know I don't know. I guess, I think he had his mind made up beforehand.

Dad: Well that's

Laura: That's what they said.

Dad: That's what the attorney said. He was putting on a good show for the press.

Def.: I just can't a, you know they just want, I've told them everything....

Laura: I believe you honey.

Dad: Oh we certainly do. Just like they were, that prosecutor was saying I tried to transfer 200,000 dollars.

Def.: Uh huh.

Dad: Robert, I merely called to see what the possibilities would be of me getting some money out for the pharmacy. I didn't request any number, I didn't mention a figure.

Def.: Yeah.

Dad: And I didn't take the power of attorney and try to do it. Not at all. So he was, so he was really spreading it on.

Def.: Well I don't know. I took it that maybe that agent had come in with all that news.

Dad: Well that could well be.

Def.: I don't know but I mean all of that stuff was just unbelievable.

Laura: I know, they just were throwing out rumors.

Def.: Well, and how did they even get those rumors?

Laura: You know where they got it from?

Def.: The housekeeper, is that [what] he said?

Laura: Uh huh, that's what your attorney said.

Def.: I mean, I don't know, she

Laura: (interrupting) She [unintelligible] the day you were gone

Def.: When I went on that little trip to

Laura: (interrupting) Uh huh

Def.: Good grief.

Dad: And the prosecutor called that out of the country.

Def.: Well, I know.

Laura: As if they know their geography.

Def.: They could easily find out if, I mean, you know, if, if, good grief.

Dad: But, Robert, we're not turning over and playing dead. We're going to continue to pray and believe God, and God has better things for you.

Def.: Is that the same place they got that so-called Cayman Island thing?

Laura: I think that's just pure speculation, you know, somebody just running their mouth saying oh, he probably did this or this, you know? I think that's what that is, just people talking. They just started to flounder when that came out. They didn't have anything to say.

Dad: Uh huh.

Def.: It's unbelievable.

Laura: There's nothing

Def.: I mean

Laura: You know, and all of that was just mouthing off. They didn't have any evidence to produce.

Dad: No, no, so

Laura: It just gave more information out there for the press.

Dad: For the press

Def.: Yeah, and they ate it up.

(P.Ex. 7; D. Ex. 32b).

9. On August 28, 2001, at 8:33 a.m., defendant telephoned his father, Robert L. Courtney, regarding the payroll of Courtney Pharmacies, Inc. (D.Ex. 38a). Defendant said, "Okay, uh, let's go ahead and put 130 hours on [Valerie]. And, with Vanessa, you know, she's been doing a lot, a lot extra. And so let's uh, let's go ahead and give her, I think normally it's on the 15th or something like that. But, let's go ahead and do her and uh go with $6,000 on her." (D. Ex. 38a; P.Ex. 9). Defendant then asked when his father normally got paid. Defendant's father said, "Well, mine is usually on the 15th for $500." Defendant said, "Well, let's go ahead and double that and do it now." (D. Ex. 38a; P.Ex. 9). The conversation continued as follows:

Dad: Now all we have here is of course Ernie's he just turned his hours in this morning, and Lee and Michelle. Well Ozma is still in the hospital but.

Def.: Yeah you'll have to kind of estimate Ozma's I think.

Dad: Yes uh huh.

Def.: And uh so you've already taken care of Carrie and Chris?

Dad: Hey yeah they're gone. They they didn't work a day after their last pay period.

Def.: Oh they didn't?

Dad: Un um.

Def.: Oh.

Dad: Carrie wanted a week's vacation and I told her well Carrie I said I think you've already used your week.

Def.: Yeah she has.

Dad: And she argued with me about it and came in the next day and gave me her key.

(P.Ex. 9).

10. Tim Wrigley, a friend of defendant's for the past 15 years, owns a private jet charter service (1Tr. at 53). About two months before defendant's arrest, Mr. Wrigley invited defendant to go to Guinea, Africa, on business (1Tr. at 54, 55). Defendant did not have a passport, so Mr. Wrigley told defendant how to obtain one (1Tr. at 54). Once defendant obtained his passport, he gave it to Mr. Wrigley so that Mr. Wrigley could get defendant's Visa (1Tr. at 54). Defendant's Visa was rejected because he had not had a particular shot. Mr. Wrigley still had possession of defendant's passport when he learned that defendant had been charged in this case (1Tr. at 54). He subsequently delivered defendant's passport to defendant's wife, Laura Courtney (1Tr. at 54–55, 56). Mr. Wrigley has no intention of assisting defendant in fleeing the country (1Tr. at 56).

11. There are at least 165 civil cases pending against defendant in Jackson County Circuit Court (1Tr. at 93–94, 97).

### III. CONCLUSION

■ I find that the new evidence offered by defendant does not alleviate the concerns which formed the basis for the original detention order on the issue of flight; however, the evidence presented does address the issue of dangerousness.

I will separately address each factor raised by the parties.

*Purchase of condominium in St. Croix*

The original detention order stated the following on the issue of the St. Croix condo: "There is some evidence, albeit unconfirmed, that defendant ... purchased a residence in St. Croix." Clearly, the possibility that defendant recently purchased a condo in St. Croix was evidence to be considered, but was not given much weight in the original decision since it was unconfirmed.

Defendant's first argument on this issue is that St. Croix is one of the U.S. Virgin Islands and, since it is an American territory, defendant's negative response to Pretrial Service's question about travel outside the United States is neither misleading nor indicative of untruthful conduct. Defendant then compares St. Croix with Alaska and Hawaii because those two states are not within the contiguous United States. This argument is unpersuasive.

Alaska and Hawaii are states. They each have a star on our national flag. Elementary school students are taught the 50 states that make up our country, and Alaska and Hawaii are included in that list. The U.S. Virgin Islands are not.

Neither is it plausible that defendant, or anyone else for that matter, would commonly refer to U.S. territories as the United States. In addition to the U.S. Virgin Islands, U.S. territories include the Northern Mariana Islands, Guam, Puerto Rico, Midway Islands, and American Samoa. The Northern Mariana Islands consist of 14 islands situated in the western Pacific just east of the Phillipines and are as far away from the west coast of the United States as Cairo, Egypt, is from Washington, D.C. Guam is south of the Northern Mariana Islands and just east of the Phillipines. It is west of the International Dateline and is therefore one day ahead of the United States. Midway Islands are more than 1,000 miles from the Hawaiian

Islands. American Samoa is located in the South Pacific roughly in the middle of a triangle drawn between the Hawaiian Islands, New Zealand and Tahiti. I doubt that anyone would consider traveling to these U.S. territories to be travel "inside the United States".[3]

In addition, there are multiple federal statutes which define "United States" as excluding the Virgin Islands. Title 18, United States Code, Section 545 criminalizes smuggling articles into the United States without abiding by the required customs procedures. That section includes the following language: "The term 'United States', as used in this section, shall not include the Philippine Islands, Virgin Islands, American Samoa, Wake Island, Midway Islands, Kingman Reef, Johnston Island, or Guam." [4] *See also One Lot Emerald Cut Stones and One Ring v. United States,* 409 U.S. 232, 93 S.Ct. 489, 34 L.Ed.2d 438 (1972); *United States v. Patel,* 762 F.2d 784, 787 (9th Cir.1985). The Tariff Act of 1930 bans persons from bringing into the United States various categories of printed material such as lottery tickets. Section 1401(h) of the Act defines the United States to exclude the Virgin Islands, American Samoa, Wake Island, Midway Islands, Kingman Reef, Johnston Island and the island of Guam. *See also Couvertier v. Gil Bonar,* 173 F.3d 450, 452 (1st Cir.1999); *United States v. Hyde,* 37 F.3d 116, 121 (3rd Cir.1994).

It is simply not reasonable to believe that defendant thought he was telling the truth when he informed Pretrial Services that he had not traveled outside the United States when he had very recently returned from St. Croix.

Defendant's second argument on this issue is that there is no evidence that defendant ever purchased a condominium in St. Croix.

Even though defendant did not make the purchase, he did go to St. Croix to look at a condominium shortly before his interview with Pretrial Services but lied about making the trip and neglected to inform Pretrial that he had been considering purchasing a residence there.

*Recent transfer of more than $2 million to the Cayman Islands*

Defendant next argues that there is no evidence that defendant transferred $2 million to an account in the Cayman Islands.

On this issue, the original detention order read as follows: "There is some evidence, albeit unconfirmed, that defendant has transferred approximately $2 million to the Cayman Islands". As was the case with the alleged condominium purchase, the possibility that defendant recently transferred $2 million to an account in the Cayman Islands was evidence to be considered, but was not given much weight in the original decision since it was unconfirmed.

As the government points out in its response, the confirmation that $2 million was not transferred to an account in the Caymans came *after* the detention hearing. Also learned after the detention hearing was the fact that defendant was attempting to transfer much more than $2 million—not to an account in the Caymans, but to his wife.

In order to truly appreciate the risk of flight defendant poses based on his ac-

**3.** If defendant's reasoning is that the Virgin Islands are physically close to the United States, it still does not explain why he would disclose a trip to the Caribbean in 2000 but not to the Virgin Islands in 2001—if the Vir-

gin Islands are close enough to consider part of the United States, the Caribbean would presumably be as well.

**4.** U.S. territories and outlying areas.

tions, especially the attempted financial transactions, a time line is helpful:

| Date | Action |
| --- | --- |
| 11/00 | Defendant (per his admission) began diluting cancer-treating drugs for patients of Dr. Hunter. |
| 03/01–05/01 | Dilution of drugs by defendant (per his admission) intensified. |
| 05/15/01 | Eli Lilly representative informed Dr. Hunter about discrepancies between defendant's drug purchase from Eli Lilly and his drug sales to Dr. Hunter's patients. |
| 06/12/01 | Dr. Hunter received a lab report indicating that a prescription filled by defendant had less than 1/3 of the amount of drug ordered. At some point, Dr. Hunter stopped ordering from defendant. She had previously paid defendant about $100,000 per month for cancer drugs. |
| 08/01/01 | Defendant told Dr. Hunter's nurse that he would give Dr. Hunter a discount if she started using his pharmacy again. Defendant was told later that day that Dr. Hunter was at the airport and could not therefore call defendant back. |
| @ 08/01 | Very shortly before the events of August 13, Defendant traveled to St. Croix and looked at a high-priced condominium. Although he was "very interested" he stated that he wanted to talk to his wife about it first. Also, sometime shortly before the detention hearing, defendant transferred in excess of $2 million to his wife. |
| 08/07/01 | Dr. Hunter ordered three chemotherapy treatments from defendant's pharmacy. |
| 08/13/01 | Dr. Hunter ordered three chemotherapy treatments from defendant's pharmacy. Later that day, federal agents spoke to defendant, confronted him with the sub-potent prescriptions, and executed a search warrant on his pharmacy. |
| 08/14/01 | The federal criminal complaint was filed. On approximately August 13 or 14, after learning of the investigation, defendant initiated the transfer of more than $5 million to his wife. |
| 08/15/01 | Defendant confessed, then was driven to the federal courthouse for his first appearance, believing that bond would be set. Defendant's car was left at his attorney's office. Defendant was taken into custody after the first appearance. That evening, defendant's wife told him on the telephone that his daughter had picked up his car. Defendant asked his wife to throw away two boxes of trash and a white sack of outdated medicine that were in the trunk of his car. |
| 08/20/01 | The detention hearing was held, and defendant was ordered held without bond. That evening, defendant, his father, and his wife spoke on the phone about the hearing, i.e., evidence of property in St. Croix and the attempted transfer of $2 million to the Cayman Islands, chalking it all up to rumors which started with the Courtney housekeeper. |
| 08/22/01 | Judge Wright entered a temporary restraining order interrupting the transfer of the remaining $2.6 million to defendant's wife. |

The events listed above clearly indicate that sometime after Dr. Hunter stopped ordering prescriptions from defendant, he flew to St. Croix to look at a specific high-priced condominium. He was very interested in the condo and told the realtor that he would talk to his wife about buying it. Defendant no doubt feared the reason Dr. Hunter had stopped sending chemotherapy orders to defendant's pharmacy after having previously purchased $100,000 worth of treatments per month. Defendant was then confronted with the sub-potent IV bags by federal agents and he watched his pharmacy searched pursuant to a federal search warrant. Defendant moved into high gear, initiating the transfer of more than $5 million to his wife and placing several boxes in the trunk of his car which were at least important enough for him to worry about on his first evening in prison. Defendant agreed to confess to the government, believing that the government would not move to detain (which the government did not). Had defendant been able to flee, he would not have had to suffer the consequences of his confession.

On August 20 during the detention hearing, defendant's wife and father sat in the courtroom listening to the accusations that defendant recently purchased property in St. Croix and that he recently transferred $2 million to the Cayman Islands. That evening on the telephone, defendant, his wife, and his father spoke on the telephone about the detention hearing. Defendant mentioned the "so-called Cayman Island thing", meaning of course the $2 million transfer to an account in the Cayman Islands. Rather than saying something along the line of, "Do you think they have

that confused with the $2 million you just transferred to me?", Mrs. Courtney referred to it as mouthing off for the press, and pure speculation. There is no doubt in my mind that she knew exactly what transfer the government was referring to when that allegation was raised during the hearing.

The following week, defendant and his father talked about the pharmacy payroll. Although defendant denies attempting to shift money to his family for unperformed services, the evidence certainly suggests that he was doing exactly that. For example, without any discussion as to how many hours his daughter Vanessa worked or what she did, he merely stated that "she's done a lot extra." Defendant stated that she was normally paid on the 15th and decided to give her $6,000. Even if the reference to the 15th meant that she got paid only once a month, a $6,000 monthly figure represents a $72,000 annual salary which is unreasonably high for a 22-year-old. This occurred after Judge Wright's order stopped a major transfer of money to defendant's wife.

*Conclusion*

Aside from all of the above, I continue to find inconsistencies in defendant's representations.

☐ Defendant told Pretrial Services that he had traveled outside the United States only twice: once to Mexico in 1984 and once on a Caribbean cruise in 2000. Actually, defendant had traveled to St. Croix very shortly before his interview with Pretrial Services.

☐ Defendant told Pretrial Services that he gives about $25,000 per year in charitable donations. In his statement given on August 20, 2001, he stated that he had given his church approximately $333,000 in each of 1999 and 2000, representing two-thirds of a $1,000,000 3-year pledge he had made.

☐ When defendant confessed, he stated that his tampering was limited to Gemzar ®, Taxol ®, Paraplatin ® and Platinol ®. Laboratory testing later confirmed that defendant also diluted or tampered with Procrit ®, Neupogen ®, Interferon, and Zofran ®.

In addition, the motivating factors for flight which existed at the time of the original hearing still exist today, and some are worse. For example, at the time of the hearing defendant was facing a one-count complaint with a maximum three-year prison sentence. Now defendant is facing a 20-count indictment with a maximum 196-year prison sentence. At the time of the original hearing, there were five civil cases pending against defendant. Now there are in excess of 150.

■ Defendant no longer has any assets to keep him in Kansas City. He is facing a loss of his personal freedom perhaps for the rest of his life. The weight of the evidence against defendant is overwhelming. I simply cannot fashion any combination of conditions of release which would reasonably assure his appearance as required. As stated during the supplemental hearing, I find that the surrender of defendant's professional licenses and operating certificates and the closure of his pharmacies alleviates the concerns I original nal had for the safety of the community. As a result, I no longer find that defendant should be detained on the basis of dangerousness.

Because I find that there is no single condition of release or combination of conditions of release that would reasonably assure defendant's appearance as required, it is

ORDERED that defendant's motion for reconsideration of detention and released on bond is denied.